## NORTH AMERICAN CAR CORPORATION et al. v. SHELL PETROLEUM CORPORATION et al.

### No. 1530.

Circuit Court of Appeals, Tenth Circuit.

July 29, 1937.

Rehearing Denied Sept. 14, 1937.

Wilbur J. Holleman, of Tulsa, Okl. (Nathan A. Gibson, of Tulsa, Okl., on the brief), for appellants.

Edward P. Marshall, of Tulsa, Okl. (J. J. D. Cobb, of Tulsa, Okl., on the brief), for appellees.

Before PHILLIPS, BRATTON, and WILLIAMS, Circuit Judges.

WILLIAMS, Circuit Judge.

The North American Car Corporation and Centorp Corporation, and the White Oak Corporation will be referred to herein respectively as "North American," "Centorp," and "White Oak," and the Shell Petroleum Corporation, Bessie M. Taylor, Executrix, and McKes Oil & Gas Company, respectively, as the "Shell," "Executrix," and "Oil Company."

North American, as a simple contract creditor, on November 9, 1932, filed its bill in equity in the Chancery Court of Delaware for appointment of receiver for White Oak. On same day, White Oak filed an answer admitting allegations of bill, and consenting to appointment of a receiver. Thereupon, on same date, said court entered an order appointing a receiver for White Oak. Thereafter, North American on same day, November 9, 1932, filed its bill in equity in the United States District Court for the Northern District of Oklahoma for appointment of an ancillary receiver to take charge of the assets of said White Oak in Oklahoma. White Oak on same day filed its answer in said proceeding admitting the allegations of the bill, and consenting to appointment of receiver, and on the same day the court appointed an ancillary receiver.

The Shell and the Executrix intervened in said proceeding, setting up that they were judgment creditors of White Oak and that North American, since January 1, 1932, either in its own name or as trustee, had owned all of the capital stock of White Oak; that North American caused to be organized the Centorp, owning all or substantially all of its stock; that during the year 1932 and prior to the commencement of the ancillary

action, North American procured and induced White Oak to transfer and assign to North American or to Centorp for North American's benefit, substantially all of the assets of White Oak, in payment of indebtedness from White Oak to North American, and sought to have the transfer set aside as fraudulent and void, and the transferred assets applied to their judgments.

Centorp was made a defendant to the intervening bill.

On September 25, 1934, the Oil Company filed an intervening petition, alleging that it was a judgment creditor of White Oak, and adopted the allegations of the intervening bill of the Shell and the Executrix and prayed for the same relief.

As disclosed by the record, the three antecedents of White Oak Corporation were Gulf States Terminal & Transport Company, White Oak Refining Company, and White Oak Gasoline Company, whose properties were transferred to White Oak on January 2, 1931, for stock issued by White Oak. North American organized Gulf States Terminal & Transport Company for the purpose of providing facilities to serve North American's tank-car customers as an adjunct to their business. Objections to the record of this investment on North American's books in form of an open account made by auditors of the Chicago Stock Exchange, were met by a rearrangement of its capital structure, by issuance of $275,000 of bonds to North American, and the issue of preferred and common stock against moneys paid in by North American's then president, H. H. Brigham; the common stock being placed in the name of L. W. Pratt, trustee, the beneficial ownership thereof being transferred to Brigham's son, E. R. Brigham, later a North·American president.

North American's money had been put into the property which later formed the basis of White Oak Refining Company. This company defaulted upon its purchase agreement with North American, and its stock was then taken over by Gulf States Terminal & Transport Company. White Oak Gasoline Company was organized at the direction of North American's Chicago office, without paid-in capital, with intention that cost of acquiring and operating its properties should be met out of earnings.

After White Oak Refining stock was taken over by Gulf States Terminal & Transport Company, the Bird Creek Company of Philadelphia was induced to invest $125,000 in a further issue of common stock, upon the strength of North American's guaranty of its investment in the form of a contract between the two whereby North American bound itself to repurchase the White Oak Refining Stock from the Bird Creek Company at cost, plus interest, not later than two years thereafter, with an option to purchase at an equivalent price during the interim.

The contract recited the "mutual interest" of the parties in the White Oak Refining project. When White Oak (Corporation) was organized, the above contract was made applicable to the stock thereof issued to replace the White Oak Refining stock, by letter arrangement between North American and Bird Creek and was later consummated, under Howard's management. The White Oak (Corporation) common stock was issued, as follows:

27,952.19 shares to Louis W. Pratt, Trustee;

19,151.44 shares to Bird Creek Company;

2,896.37 shares to Victor H. Smith.

Later, Smith transferred the shares standing in his name to Pratt, trustee, and a certificate therefor as such was issued to Pratt. Therefore, Pratt, as trustee, held all of the White Oak common stock except the Bird Creek shares which were held under said guaranty by, and option to, North American, for purchase at its pleasure. No instrument in writing, defining the beneficiary of Pratt, as trustee, was produced. The Brighams were dead at time of trial. Pratt testified that he held the stock for them, but his testimony was opposed by his two previous written declarations that the real owner of the stock was North American. When pressed for explanation as to why he had, prior to that time, made such written declaration, he stated that Howard and Roblee, respectively president and vice president of North American, had at one time claimed ownership of it for North American. The certificates had been indorsed in blank by Pratt and transmitted, he said, to E. R. Brigham, then president of North American. Roblee, however, testified that Pratt had sent the certificates to him, and that he had given Pratt a receipt for them, which North American's answers to interveners' interrogatories conceded was, North American's receipt without showing or stating in what capacity or for what pur-

pose it received same on April 24, 1931. No receipt thereafter was produced by Pratt, and Roblee said he couldn't find his copy. Howard, North American's then chairman, received the indorsed certificates from E. R. Brigham, then president of North American, to whom Roblee had delivered them in the spring of 1931, and, in turn, delivered them to North American's treasurer with instructions to hold them. Whatever record of North American's holding of the certificates might exist would be in the form of the treasurer's notation, according to Roblee, which likewise was not produced; the certificates having remained in North American's hands during all that time. Roblee said they were held "as security," but for what purpose does not appear.

Brigham did not owe North American, according to Roblee, and the stock could not, therefore, have been held as collateral to any obligation due from him. Roblee suggested that Brigham had loaned North American the stock, but neither stating for what purpose nor why the stock was not turned over to or demanded by the personal representative of Brigham, upon his death, if he were in fact its beneficial owner. Howard stated, "we had the stock to protect our interests," apparently meaning to enable North American to control corporate action by White Oak.

L. W. Pratt was general counsel for North American, as well as an officer and director of White Oak. At the time he held the White Oak stock as trustee, he was acting as trustee for North American in holding title of other properties in Oklahoma, including North American's interest in several oil properties in the Oklahoma City field.

Title to one particular interest was vested in him without any record being made of North American's beneficial ownership of it, North American's real ownership therein being thereby concealed. Howard's opinion was that this policy of secretiveness was for the best interest of North American. Pratt was North American's confidential agent as to Garrett-Rucker, Katy, and Buchanan properties and no disclosure was made "of record or otherwise," of North American's relationship to these properties. The personnel of White Oak's officers was dictated by North American's president to Pratt by letter from North American's Chicago office, copy of which appears to have gone to Godfrey M. Brigham, North American's vice president in charge at Tulsa. Brigham was also advised, upon "inter-office correspondence" memoranda, of instructions to Johnson, White Oak president, to advise with Pratt, North American general counsel, "on matters of policy and expenditures." Pratt was also given instructions respecting dismissal of a named White Oak employee. Johnson, White Oak president, asked for and was given instructions as to filling vacancies on the White Oak board. Two of such vacancies were filled by North American's Chicago lawyers. Under instructions, North American was kept advised of personnel of employees and audit reports were regularly forwarded to it. Johnson, president, and Green, vice president, testified as to repeated instructions received by telephone, telegram, letter, and personal interview from North American's officers as to management of the White Oak business, which were carried out.

Johnson and Green evidently understood that they were indirectly employees of North American, as they were advised by Pratt that North American was the real owner of White Oak and attributed their employment to North American. When financial statements came to Howard's attention indicating an indebtedness of White Oak to North American, he rebuked Johnson, by letter saying: "It is also desirable that Mr. Brisco not become acquainted with the fact that North American is interested in White Oak, except perhaps because of its owning some bonds, and this information should not be volunteered. I thought I was definite in my remarks when I was in Tulsa as to the necessity of keeping the North American out of any picture which had any connection with White Oak. The North American in Oklahoma is interested in the leasing of tank cars only as far as the public is concerned."

Both Johnson and Green, as the latter testified, had frequently been warned to conceal North American's "interest in White Oak," Green further saying: "North American's officers directed everything, positively, we couldn't move unless we had their approval. Couldn't make a deal unless they approved it. I consulted them for approval in every instance." Johnson also testified: "I had occasion constantly to solicit the advice or instructions from North American's officers in respect to White Oak's af-

fairs. I received instructions from North American's officers in respect to the operation of White Oak's business and management of its affairs, and such instructions given to me were frequent. Those instructions took the form of personal conversations with the officers; also telephone conversations and by letter * * * and I don't think there were ever very many instances in which we refused to carry out their instructions."

By the first of 1932, White Oak was hopelessly insolvent. In February of that year and, again, in April, North American made advancements of $30,000 and $20,000, respectively, receiving assignments of accounts as collateral. On May 12, 1932, Howard wrote a letter to Pratt, then general counsel for North American, with reference to the appropriation of all of White Oak's remaining unmortgaged assets to North American's claim against it for antecedent loans and as to whether such might involve a liability, stating, in effect, "why should we worry" about others having claims against White Oak, and directed that the White Oak properties be parcelled out among itself and two lien creditors, with the result that there will be "nothing left except the corporate name and certain lawsuits that are pending." On May 24, 1932, the transfer of White Oak's unmortgaged assets was made to North American, pursuant to said instructions given by North American officers, leaving nothing left from which the claims of interveners might be satisfied.

The trial court found that the North American dictated the personnel of the officers and directors of White Oak, dominated over and controlled its officers, directors, management, and affairs, requiring the managing officers of White Oak to consult the North American in respect to the policies to be pursued in the operation and management of White Oak's business. It further found that White Oak, while insolvent, transferred to Centorp, for the North American, in the months of February, April, and May, 1932, assets of a stated value of $421,417.41 to apply upon indebtedness owing ·by White Oak to the North American, and that thereby it secured practically all of its assets with intent to defeat, delay and defraud interveners, as creditors thereof.

■■ The lower court correctly found and held that transfer of May 24, 1932, con-

stituted a fraud against interveners as creditors of White Oak. The evidence also justified a finding and holding that the North American was the beneficial owner of the shares of stock held by L. W. Pratt as trustee, and holder by option of that in the name of Bird Creek Company, of Philadelphia, in White Oak.

■ Section 10012, Oklahoma Compiled Statutes 1931 (24 Okl.St.Ann. § 11), embodying the common-law rule allowing an insolvent debtor to prefer one or more creditors, in good faith, to the exclusion of others, has no application where a creditor controls and dominates the affairs and business of an insolvent corporate debtor, and exercises such influence over such debtor, causing his claim to be preferred by a transfer of the entire corporate properties to himself, leaving other creditors no opportunity for realization upon their claims. Jenkins Petroleum Process Company v. Credit Alliance Corporation et al. (C.C.A. 10) 83 F.(2d) 532; Heim v. Jobes (C.C.A. 8) 14 F.(2d) 29; Stuart v. Larson (C.C.A. 8) 298 F. 223, 38 A.L.R. 79; Kitchen v. Canavan (C.C.A.) 22 F.(2d) 116; Jackman v. Newbold (C.C.A. 8) 28 F.(2d) 107, 62 A.L.R. 729; Central Trust Co. v. Southern Oil Corporation (C.C.A. 8) 8 F.(2d) 338; Southern Pacific Co. v. Bogert, 250 U.S. 483, 39 S.Ct. 533, 63 L.Ed. 1099; Union Coal Co. v. Wooley, 54 Okl. 391, 154 P. 62, 19 A.L.R. 312.

As to appellants' objection to the decree which awarded interveners the amount of their judgment demands against North American and Centorp on the ground that the lower court should have decreed to interveners, at most, only the ratable share of the value of the assets transferred as allocable to their demands, or personal judgments, in equivalent amount.

The value of the assets transferred, as stipulated between White Oak and North American when the transaction was had, was $421,417.45. North American's claim against White Oak, as stated by its answer, was $786,549.13, which was credited by the above stated amount following the transfer. White Oak's insolvency was conceded. Claims of other creditors, exclusive of interveners, as reported by the receiver, amounted to about $232,464.14. The judgment demands of interveners amounting to $11,192.82, when added thereto, makes a total of $243,656.97 then outstanding as claims of others than the North American.

In Senter v. Williams, 61 Ark. 189, 32 S.W. 490, 491, 54 Am.St.Rep. 200, the rule is announced that: "Though it is the favorite policy of a court of equity to distribute assets equally among creditors pari passu, yet, whenever a judicial preference has been established, by the superior legal diligence of any creditor, that preference is always preserved, in the distribution of assets, by the court." See, also, M'Dermutt v. Strong, 4 Johns.Ch.(N.Y.) 687; Clark v. Figgins, 31 W.Va. 156, 157, 5 S.E. 643, 13 Am.St.Rep. 860; Wallace's Adm'r v. Treakle, 27 Grat.(Va.) 479, 487, and Smith v. Craft (C.C.) 12 F. 856.

Doster v. Manistee Nat. Bank, 67 Ark. 325, 55 S.W. 137, 138, 48 L.R.A. 334, 77 Am. St.Rep. 116, in no way limiting or modifying Senter v. Williams, supra, comments on the effect of a contrary doctrine, wherein it says: "It would impose oftentimes upon the junior judgment creditor the expensive, but still thankless and bootless, task of uncovering assets, which, by his diligence, he had discovered, for the benefit of another, or else the disagreeable experience of seeing the fraudulent debtor concealing and appropriating to his own use assets which justly belonged to his creditors."

See, also Elliott School District v. Gorder, 55 N.D. 823, 215 N.W. 281; Hinton v. Saul, 37 Wyo. 78, 259 P. 185, 187; Vial v. Walker, 248 Ky. 197, 58 S.W.(2d) 415; Baily v. Hornthal, 154 N.Y. 648, 49 N.E. 56, 60, 61 Am.St.Rep. 645; Murtha v. Curley, 90 N.Y. 372; 27 C.J. 855, and Wilkinson v. Livingston (C.C.A. 8) 45 F.(2d) 465.

After study of the evidence in the record, the conclusion is reached that as to the stock of White Oak held in the name of L. W. Pratt, as trustee, and that by Bird Creek Company of Philadelphia, the North American was the beneficial owner or controller thereof, and that the transfer by White Oak to the North American was fraudulent and void as against the interveners, and that the North American was not entitled to have the assets ratably distributed to all of the creditors of White Oak, including itself. Interveners, being diligent and in good faith, are entitled to the benefit of their action resulting in a decree in their favor to the exclusion of other creditors.

Shell and Taylor (executrix), judgment creditors, filed their intervention petition on behalf of themselves and other creditors. The Oil Company, a judgment creditor,

joined with them and helped carry the brunt of the litigation. The decree in their favor for the amount of their judgments, no other creditors having appeared as claimant, is affirmed.